COMMONWEALTH vs. FRANCIS E. CULLEN, JR.

Norfolk. April 2, 1985. — June 19, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Insanity. Evidence,* Of sanity.

At the jury-waived trial of indictments arising from the shooting of two
    policemen by the defendant, during which the defendant introduced
    expert testimony that he was not criminally responsible for his conduct,
    there was sufficient evidence as matter of law to warrant the finding
    that the defendant was criminally responsible despite the Common-
    wealth's failure to offer any evidence of his sanity. [228-231]
In the circumstances of a criminal trial, following which the defendant had
    moved for a new trial but had claimed no appeal from the denial of his
    motion, this court granted the defendant leave to file a second motion
    for a new trial based on the weight of the evidence of his criminal
    responsibility. [231]

INDICTMENTS found and returned in the Superior Court De-
partment on February 14, 1983.

The cases were heard by *Robert A. Barton*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Maureen S. Duggan* for the defendant.

*Charles J. Hely*, Assistant District Attorney (*David C. Phal-
en*, Assistant District Attorney, with him) for the Common-
wealth.

ABRAMS, J. After a jury-waived trial in which the sole issue
was the defendant's criminal responsibility, the defendant,
Francis E. Cullen, Jr., was convicted of assault with intent to
murder (two counts), assault and battery by means of a danger-
ous weapon (two counts), and unlawfully carrying a firearm.
The defendant appealed his convictions claiming that although
"there may be some evidence supporting a conclusion of sanity
. . . [t]he Commonwealth did not produce sufficient evidence

. . . from which a reasonable trier of fact could infer the sanity of the Defendant beyond a reasonable doubt." A divided panel of the Appeals Court affirmed the judgments. *Commonwealth* v. *Cullen*, 18 Mass. App. Ct. 644, 645 (1984). We granted the defendant's application for further appellate review. We affirm.

We summarize the evidence. In the early morning of February 5, 1983, the defendant Cullen threw a rock at a marked police cruiser driving on Central Avenue in Milton. The police officer in the cruiser, Paul Nolan, pulled over and approached the defendant, who was standing in the driveway of his home, to inquire about the incident. Cullen did not respond to the inquiry. As Officer Nolan approached and repeated the question, Cullen drew an unlicensed handgun from his waist and fired three shots, two of which hit Officer Nolan. The defendant disappeared behind his house momentarily, only to return and fire upon Officer Charles Paris, who had arrived on the scene and was kneeling beside Officer Nolan, radioing for help. One bullet struck Officer Paris in the back, and another shot damaged the portable radio on Officer Nolan's hip. Officer Paris turned and fired in the direction of Cullen, who then fled.

Additional police, arrived and soon after receiving a radio report of an attempted break-in at the residence of Cullen's former lawyer, a few houses from Cullen's home, one officer apprehended the defendant in the rear of that residence. Officer Michael Breen, with service revolver drawn, then ordered, "Frankie, give it up." Cullen turned his back to Officer Breen and placed his hands on the side of the house, but as Officer Breen approached, began to back away. Believing him about to flee, Officer Breen grabbed Cullen from behind, restraining him. Both men fell to the ground. After Officer Paris handcuffed Cullen's wrists behind his back, he searched for a handgun. Cullen "began to thrash about from left to right," which gyrations soon revealed to the police a handgun under his back approximately at his beltline. Cullen had reloaded his gun before being apprehended. Prior to the incident, Cullen had been drinking with a friend for six or more hours.

Cullen did not testify at trial, nor did he substantially contest these facts. His defense consisted of the oral testimony of one and the written report of a second psychiatric expert as to his lack of criminal responsibility for the two shootings. The expert testimony and report revealed that Cullen told the doctors that the Milton police were "out to get him," that they, and other police departments from eastern Canada to New York City, had kept him under twenty-four hour surveillance for more than seven years. He asserted that his phone was bugged. The police played "mind games" with him that "let him kill people," and caused "pins and needles" in various parts of his body. The police interfered with his love life, which Cullen said potentially included five hundred women whom he knew to be attracted to him, by telling women that he was a sex pervert. Cullen told the psychiatrist that he had purchased the handgun, which he had used in the assaults, "on the street," had thrown a rock at the police cruiser, and had shot Officers Nolan and Paris in self defense to protect himself from the police. He told the psychiatrist that, while it would have been easy to kill the wounded Officer Nolan, he refrained from doing so because he had intended only to "put him out of service." Cullen insisted that he had fled to his lawyer's house only because "he was sure that the police would not kill him in front of . . . his attorney."

Both psychiatrists concluded, on the basis of slightly different diagnoses, that Cullen lacked criminal responsibility under the test elaborated in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), i.e., that, because of a mental disease or defect, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Dr. Annaliese Pontius, who had interviewed the defendant once three and a half months after the shootings, diagnosed Cullen as suffering from "schizophrenia, paranoid type" and "erotomania." When during the trial she received the results of an electroencephalogram (EEG test) revealing minimal physical abnormalities, Dr. Pontius changed her diagnosis to include the possibility of an organic type of psychosis in addition to a functional type such as schizophrenia.

According to a written report by Dr. Martin Kelly, who had interviewed the defendant five months after the incident, Cullen was operating under a paranoid delusional system.

The issue is whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found Cullen to be criminally responsible beyond a reasonable doubt. *Commonwealth* v. *Shelley*, 381 Mass. 340, 346 (1980). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). See *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [sanity] beyond a reasonable doubt.'" *Commonwealth* v. *Latimore, supra* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). Because the crimes for which the defendant was convicted were not capital, the broad standard of review under G. L. c. 278, § 33E (1984 ed.), whether the finding of criminal responsibility was against the weight of the evidence, is unavailable.[1] See Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979); *Commonwealth* v. *Cook*, 380 Mass. 314, 320-321 (1980). We must determine only whether the convictions should be reversed because the evidence on the defendant's sanity is insufficient as a matter of law.

The defendant does not argue that the Commonwealth had not presented sufficient evidence of his criminal responsibility by the close of its case-in-chief. Rather, he claims that the Commonwealth's proof of the issue deteriorated between the time the Commonwealth rested and the close of all the evidence, and therefore the judge should have made a required finding of not guilty by insanity at the close of all the evidence. See *Commonwealth* v. *Lunde*, 390 Mass. 42, 46-47 (1983); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 n.5 (1978); *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976).

---

[1] The defendant's reliance on *Commonwealth* v. *Guiliana*, 390 Mass. 464, 469 (1983) (reversing guilty verdict as against weight of evidence), is therefore misplaced because we reviewed that case under the broad standard of G. L. c. 278, § 33E (1984 ed.). See *Commonwealth* v. *Gould*, 380 Mass. 672, 680 (1980); *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980).

Cullen asserts that the evidence produced by the Commonwealth did not meet its burden of proving his sanity because he introduced evidence from two psychiatric experts as to his lack of criminal responsibility for the shootings under the *McHoul* test. See *Commonwealth* v. *Kostka*, 370 Mass. 516, 526 (1976). He argues that, by failing to produce either lay or expert testimony as to his sanity, the Commonwealth did not prove his sanity beyond a reasonable doubt. See *id.* at 540 (Hennessey, C.J., dissenting in part). See also *Commonwealth* v. *Lunde, supra* at 48-49; *Commonwealth* v. *Werner*, 16 Mass. App. Ct. 686, 689-690 (1983). It was within the discretion of the fact finder to place little or no weight on the evidence from the two psychiatrists in the instant case. *Commonwealth* v. *Lunde, supra* at 47, and cases cited. The judge could have disbelieved the psychiatric and defense evidence in its entirety. "The law 'does not give the opinions of experts . . . the benefit of conclusiveness, even if there are no contrary opinions introduced at trial.'" *Commonwealth* v. *Lunde, supra* at 47, quoting *Commonwealth* v. *Smith*, 357 Mass. 168, 178 (1970), and cases cited.

Further, in this case, there is no long history of mental illness or hospitalizations. See *Commonwealth* v. *Cole*, 380 Mass. 30, 36 (1980); *Commonwealth* v. *Lunde, supra* at 46; *Commonwealth* v. *Gould*, 380 Mass. 672, 675 (1980); *Commonwealth* v. *Werner, supra* at 688. Thus, the judge could view the evidence of insanity with scepticism. The judge also could have accorded the expert testimony less authority because the diagnoses differed slightly,[2] and were based on interviews too remote from the date of the incident. *Commonwealth* v. *Brown*, 387 Mass. 220, 223 (1982).

Finally, the judge was entitled to infer sanity from the facts underlying the crime and evidence of Cullen's actions before and after the crime. *Commonwealth* v. *Amaral*, 389 Mass.

---

[2] Dr. Pontius altered her diagnosis during the trial and had not seen the police account of the shootings before making her diagnosis. Dr. Kelly apparently had made his report unaware of the defendant's six hours of drinking before the shootings.

184, 192 (1983). *Commonwealth* v. *Kostka, supra* at 530-531. The defendant had steady employment as a crane operator. He lost his job not because of mental illness but because the plant closed. Aside from the report of one expert that Cullen had been in a residential treatment program of an unspecified type over twenty years before the shooting,[3] the defendant presented no records or evidence of psychiatric hospitalizations or treatment for mental illnesses.

Viewing the evidence in the light most favorable to the Commonwealth, the judge could conclude that the defendant was criminally responsible for his behavior. Cullen did not shoot wildly; rather, almost all of his shots hit either the clothing or bodies of the two police officers. The defendant's flight to his lawyer's house, and his surrender in response to the police officer's shout to "give it up" indicate the defendant had the capacity to appreciate the criminality of his conduct. The judge could have inferred that Cullen's thrashing on the ground was an attempt to reach his gun, and thus have an advantage on the police. Furthermore, the judge could consider whether the defendant's conduct was related, not to a lack of criminal responsibility but to the fact the defendant had been drinking for six hours prior to the shooting. Inferences drawn from circumstantial evidence "need not be inescapable or necessary, so long as they are reasonable, possible and not unwarranted because too remote." *Commonwealth* v. *Walter*, 10 Mass. App. Ct. 255, 257 (1980). *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980).

The judge, as the trier of fact, was in the best position to evaluate the evidence on the issue of the defendant's sanity.

---

[3] Dr. Kelly also mentioned in his report that the defendant had been referred for psychiatric treatment in connection with several unrelated arrests.

We conclude that, viewed in the light most favorable to the Commonwealth, the evidence was sufficient for the judge to find the defendant sane beyond a reasonable doubt.[4]

*Judgments affirmed.*

---

[4] In his dissent to the Appeals Court decision, Justice Kass noted "the extreme thinness of evidence" on Cullen's criminal responsibility. *Commonwealth* v. *Cullen,* 18 Mass. App. Ct. 644, 655 (1984) (Kass, J., dissenting). That comment, however, goes to the weight, not the sufficiency, of the evidence. The defendant filed a motion for a new trial, which the trial judge denied. The defendant did not appeal from the denial of his motion. Therefore, we now review the record only to determine if there is sufficient evidence to support the judge's decision. Generally, a defendant may not raise claims he could have made in a prior proceeding by refiling a new trial motion where he did not appeal the denial of his original new trial motion. See *Commonwealth* v. *Pisa,* 384 Mass. 362, 366 (1981). In this case, however, we expressly grant the defendant leave to file a second new trial motion based on the weight of the evidence. Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). See *Commonwealth* v. *Gould, supra* at 679-680; *Commonwealth* v. *Cole, supra* at 37-39. The judge should consider such factors as the defendant's prior history of, and hospitalization for, mental illness, and the strength of the Commonwealth's circumstantial evidence of sanity, including the testimony of lay witnesses, as well as the absence of expert testimony on behalf of the Commonwealth. See *Commonwealth* v. *Guiliana,* 390 Mass. 464, 470-471 (1983); *Commonwealth* v. *Kostka, supra* at 540 (Hennessey, C.J., dissenting). After a hearing and the judge's decision on the motion, the losing party may appeal.